UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| JERMAINE SUTTON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 3:10-0400 |
| | ) Judge Sharp |
| METROPOLITAN GOVERNMENT OF | ) |
| NASHVILLE AND DAVIDSON COUNTY, and | ) |
| RICHARD MARTIN, in his individual and | ) |
| official capacities as a Metro Police Officer, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM

This is a false arrest case which arose after Plaintiff Jermaine Sutton was arrested for allegedly stealing some baby-back ribs from a Kroger grocery store. Previously, this Court denied Defendant Metro Police Officer Richard Martin's Motion to Dismiss based upon qualified immunity grounds. That decision was affirmed on appeal, but the scope of Plaintiff's Fourth Amendment claim against Officer Martin was limited by the Sixth Circuit. Sutton v. Metro. Gov't of Nashville & Davidson Cnty., 700 F.3d 865 (6th Cir. 2012).

Now pending before the Court are the fully briefed Motions for Summary Judgment filed by Defendants Metropolitan Government of Nashville and Davidson County ("Metro") (Docket No. 74) and Officer Martin (Docket No. 77). For the reasons that follow, Metro's Motion will be granted, but Officer Martin's Motion will be denied.

## I. FACTUAL BACKGROUND

During the evening of April 21, 2009, John Szcerbiak ("Szcerbiak"), a Kroger loss prevention officer, observed a black male placing packages of baby-back ribs in the waistband of

2

his pants. Szcerbiak contacted John Bouchard, another loss prevention officer, and instructed him to try to cut the suspect off at the front of the store. While being followed by Szcerbiak, the suspect became alarmed and started running around the store, during which time packages of ribs and a cell phone fell to the ground. After a couple of minutes, the suspect ran outside the store with Bouchard in pursuit. Bouchard chased the subject across the Kroger parking lot and into the woods. Bouchard claims that the suspect was at least "six-two, six-three," with bushy hair and a beard that appeared to have been growing for several days.

After chasing the suspect into the woods, Bouchard called 911 at 6:20 p.m., and identified the suspect as a black male wearing a red and black plaid jacket or shirt, and blue jeans.[1] Officer Martin responded to the call.

The Kroger store is on Old Hickory Boulevard, across a multi-lane street from Summit Medical Center ("Summit"). Officer Martin claims that after arriving at the Kroger store he was told the suspect was a black male of medium build and approximately 6 feet tall. Szcerbiak told Martin that he could positively identify the suspect if he were to see him again, and that he desired to press charges were the suspect caught.

Using the cell phone recovered at the scene, Officer Martin called the first contact in the phone. This contact turned out to be Arginer Richardson who, when asked if she knew anyone in the area where the cell phone was found, told Officer Martin that her godson, Jermaine Sutton, worked at Summit. Officer Martin ran a computer check on "Jermaine Sutton" and found that individual had a criminal history (although no felony convictions or any convictions for theft). The

---

[1] Bouchard told the dispatcher that during the encounter the suspect's jacket was pulled off. Since this may have been a reference to the "red and black plaid jacket or shirt," the Court will limit this description going forward to a thief wearing blue jeans.

3

picture associated with the name was that of an African American male with a medium build. According to the dispatch call recordings, Officer Martin radioed another officer and told him that the suspect was "working up here at Summit," and that he was "gonna run-up in here real quick and try to get him."

Officer Martin drove to Summit to speak with Jermaine Sutton and was directed by security to the cafeteria where Plaintiff was working. When asked by Officer Martin about the phone found at the Kroger store, Plaintiff produced his own cell phone. This apparently did not allay Officer Martin's suspicions because, in his experience, criminal suspects are likely to have more than one cell phone.

Plaintiff is a black male and stands 5'10". When approached by Officer Martin, Plaintiff was clean cut and beardless. He was wearing black hospital scrubs and nice shoes.

On the day in question, Plaintiff worked the 10:45 a.m to 7:15 p.m. shift as a utility assistant in the kitchen. He claims that he took a lunch break from 1:00 to 1:30 p.m., and then a smoke break from 5:45 to 6:00 p.m. Plaintiff claims that he drove around the perimeter road of Summit during his smoke break because the hospital is a smoke- free campus.

Between 7:00 and 7:15 p.m., Plaintiff was working the dishwasher when he was told by the cashier that someone was there to see him. He went into the cafeteria and was met by four officers. Officer Martin was the first to speak and began by asking Plaintiff about the location of his phone. Officer Martin then asked Plaintiff what he thought the odds were that someone listed in the contacts of the cell phone found at the Kroger store would give police his name. Plaintiff responded that he did not know, but that the cell phone was not his.[2] Plaintiff also claims that Officer Martin said that

---

[2] As it turns out, the cell phone belonged to David Booker.

he (Plaintiff) looked "like a player" and could have two phones so that his wife would not know that he was "messing around on nurses."

During the discussion in the cafeteria, one of the officers said that Plaintiff had mud on his shirt from when he fell in the creek. Plaintiff did not know what he was talking about and said that the dirt on his shirt was from food particles from cleaning the dish-washing machine.

At some point, Officer Martin asked Plaintiff to sign a citation in lieu of being taken into custody. However, Plaintiff refused because he did not want to admit to something that he did not do and would lose his job were he to sign the citation.

According to Victoria Ndiaye, another utility worker, she worked with Plaintiff the entire day of the incident. They both took a break at around 5:45 p.m. that would have lasted no more than 10 minutes because they had to be back on the line by 6:00 p.m., although she concedes that during the break she went to the break room while Plaintiff went outside to smoke. She also claims that the spots on Plaintiff's clothing were from the foam used to clean the dish machine. She claims that she told the officers that Plaintiff had been at work with her, but the officers did not seem interested in hearing from her.

After approximately 15 to 20 minutes, Plaintiff, flanked by Officer Martin and another officer, was escorted from the cafeteria to the visitor's entrance at the front of the hospital. After approximately two to three minutes, Mr. Szcerbiak and Mr. Bouchard arrived by car and stopped five to seven car lengths from Plaintiff and the officers. Mr. Szcerbiak immediately identified Plaintiff as the shoplifter.

Officer Martin handcuffed Plaintiff and put him in the back seat of his police car. Again Plaintiff was given the opportunity to sign a citation, but he refused.

5

Plaintiff was then driven to the Kroger store and, upon arrival, Officer Martin went inside to view the videotape. After doing so, he came back out to the car and said that he wanted to take another look at the videotape to be sure. Mr. Bouchard came out to the police car and told both Officer Martin and Plaintiff that the did not think Plaintiff was the man captured on the videotape. Plaintiff then asked Officer Martin if he heard that, and Officer Martin said that he had to go on what Mr. Szcerbiak said, but that he would give Plaintiff the benefit of the doubt and look at the tape again.

After viewing the tape at least one more time, Officer Martin returned to the vehicle and told Plaintiff that Mr. Szcerbiak wanted to press charges. Mr. Bouchard said he did not want to sign the arrest warrant because he did not think Plaintiff was the shoplifter.

After approximately 45 minutes, Plaintiff was driven to the police station. Office Martin wrote an affidavit for theft for Mr. Szcerbiak to sign. Mr. Szcerbiak signed it as the "prosecutor," and Officer Martin was listed as the arresting officer.

Plaintiff was booked, fingerprinted, and jailed for approximately four hours until his wife was able to post bond. Plaintiff was tried and acquitted of the theft charge on June 26, 2009. This litigation followed.

## II. STANDARD OF REVIEW

A party may obtain summary judgment if the evidence establishes there are no genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). In ruling on a motion

for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in his or her favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### III. APPLICATION OF LAW

**A. Officer Martin's Motion for Summary Judgment**

    *1. Federal Claims*

Officer Martin moves for summary judgment arguing that "based on the facts in the record, Officer Martin's detention of Sutton at Summit was a permissible Terry[3] stop" and that, "even if the detention converted to a custodial arrest at some point prior to Szcerbiak's identification, Officer Martin had probable cause to arrest Sutton." (Docket No. 78 at 7). Alternatively, Officer Martin argues that he is entitled to qualified immunity because "it was certainly not clearly established as of April 2009 that Officer Martin did not have reasonable suspicion and/or probable cause to detain Sutton for 15-20 minutes at Summit to await an eyewitness identification," given the facts that he then knew. (Id.).

In response, Plaintiff argues that summary judgment in Officer Martin's favor is unwarranted for several reasons. He contends that Officer Martin did not have the requisite reasonable suspicion to approach him at Summit in light of the fact that Ms. Richardson did not make a connection between Plaintiff and the cell-phone, that Officer Martin did not have probable cause to arrest or continue to detain him after he produced his own cell phone, and that questions of fact exist as to whether the show-up identification was unreasonably suggestive.

The Court is not writing on a *tabula rasa*. The parties (and Plaintiff in particular) raise

---

[3] Terry v. Ohio, 392 U.S. 1 (1968).

7

arguments that go beyond the scope of what remains in this case in light of this Court's prior ruling and the Sixth Circuit's decision.

In its ruling on Defendants' Motion to Dismiss, this Court dismissed Plaintiff's Fifth and Fourteenth Amendment claims and his conspiracy claim. The Fifth Amendment claim was dismissed because it appeared that Plaintiff had abandoned it, and, if he had not, dismissal was appropriate because "'the Fifth Amendment's Due Process Clause circumscribes only the actions of the federal government.'" (Docket No. 42 at 6) (quoting Scott v. Clay County, 205 F.3d 867, 873 n.8 (6th Cir. 2000)). The Court dismissed Plaintiff's Fourteenth Amendment claim insofar as it was based upon the alleged unlawful seizure and false arrest because the Fourth Amendment provided the analytical framework for such claims. The Court also observed, however, that insofar as Plaintiff was alleging a Fourteenth Amendment due process violation as a result of the allegedly suggestive line-up, the same failed as a matter of law because he did "not allege that the procedure utilized made his trial unfair, or that the harm was irreparable." (Id. at 9). Finally, the conspiracy claim was dismissed because the sole paragraph containing that claims contained "little more than a formulaic recitation of the elements [of a conspiracy claim] coupled with conclusory factual allegations." (Id. at 14).

Plaintiff did not file a motion to reconsider or otherwise challenge this Court's ruling. Nor did he move to file an amended complaint to rectify any perceived deficiencies.

For his part, Officer Martin filed an interlocutory appeal challenging this Court's conclusion allowing the unreasonable seizure and false arrest claims to go forward. As noted, the Sixth Circuit affirmed this Court's ruling, but did "so by considerably narrowing the scope of Sutton's Fourth Amendment claim." Sutton, 700 F.3d at 869. Specifically, in the penultimate paragraph of its

8

opinion, the Sixth Circuit wrote:

> In sum, Officer Martin is protected by qualified immunity with regard to his initial contact with Sutton and in continuing to detain Sutton after the latter was positively identified by Szcerbiak. But the allegations of Officer Martin's conduct between those two events are sufficient to state a claim that precludes qualified immunity at this stage in the litigation.

Id. at 878.

Some discussion of how the Sixth Circuit arrived at that decision is helpful because it cabins this Court's review. The Sixth Circuit began by observing that "[t]his case turns on whether Officer Martin had reasonable suspicion to detain Sutton or probable cause to arrest him." Id. After noting that this Court dismissed Plaintiff's claims against Officer Martin (save for the unreasonable seizure claim under the Fourth Amendment), the Sixth Circuit first concluded that Officer Martin's initial encounter with Plaintiff was an investigatory detention for which Officer Martin had the requisite reasonable suspicion because a cell phone had been found at a store where a theft had just occurred, and a person identified as a contact in the phone told Officer Martin that she knew a person named Jerome Sutton who worked at Summit. With this information Officer Martin was entitled to find and question Plaintiff about the cell phone.

The allowable inquiry at this point was not unbridled because the "the permissible scope of Officer Martin's initial detention of Sutton was to ascertain his identity and to ask limited question regarding the cell phone found at the Kroger store." Id. at 874. When Officer Martin asked Plaintiff about the cell phone, "the restraint on Sutton's freedom at this point was quite limited, [and] the Terry stop had not converted into an arrest." Id. The Sixth Circuit opined that "[h]ad Sutton's detention ended here, his Fourth Amendment would not have been violated." Id.

However, once Sutton produced his phone, Officer Martin could not rely on wild speculation

9

about Plaintiff running around with nurses to discount that exculpatory information. Having received an answer to his cell-phone inquiry that did not produce more suspicion and knowing no other facts that could justify the investigatory detention (based on the allegations in the Amended Complaint), Officer Martin lacked a reasonable basis for detaining Sutton any further.

The Sixth Circuit then opined that Plaintiff's continued detention "amounted to an arrest prior to Szcerbiak's identification" because it "went beyond questioning Sutton about the cell phone and had several characteristics of 'a show of authority' that the Supreme Court has found tantamount to an arrest." Id. These factors included that "Sutton was surrounded by four officers, told that he was a suspect, had his property confiscated . . . was grasped by the arm and escorted away from his place of work," and was told by Officer Martin that he "could not go anywhere or do anything." This exceeded the permissible scope of a Terry stop because

> Officer Martin's sole basis for suspecting that Sutton was the shoplifting perpetrator was an alleged connection to the cell phone found at the Kroger grocery store, and this basis was neutralized when Sutton produced a cell phone from his own pocket . . . . Sutton's forcible removal from the hospital exceeded the bounds of a Terry stop and was thus an arrest requiring probable cause. Officer Martin does not contend that he had probable cause to arrest Sutton absent Szcerbiak's identification. Sutton has therefore adequately pleaded that he was arrested without probable cause when he was removed from the hospital.

Id. at 876.

Given this background, the Court is presented with the sole question of whether Officer Martin had probable cause to arrest Plaintiff before he was identified by Szcerbiak. The Court finds that questions of fact exist on this issue making summary judgment inappropriate.

"The probable cause standard is a 'practical, non-technical conception' that deals with the 'factual and practical considerations of everyday life.'" United States v. Frazier, 423 F.3d 526, 531 (6th Cir. 2005) (quoting, Illinois v. Gates, 462 U.S. 213, 231 (1983)). The sufficiency of probable

10

cause to justify an arrest is determined by "whether at that moment the facts and circumstances within [the officer's] knowledge and of which [he] had reasonably trustworthy information w[as] sufficient to warrant a prudent man in believing that the [arrestee] had committed or was committing an offense." Beck v. Ohio, 379 U.S. 89, 91 (1964). "A reviewing court must assess the existence of probable cause 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" Radvansky v. City of Olmsted Falls, 395 F.3d 291, 302 (6th Cir. 2005) (quoting Klein v. Long, 275 F.3d 544, 550 (6th Cir. 2001)).

Officer Martin argues that he had probable cause because the evidence shows that "(1) Jermaine Sutton's name had been provided to Officer Martin by a contact found in a phone dropped at the scene of the crime; (2) Sutton matched the physical description of the suspect; (3) Sutton was working less than a mile from the Kroger; (4) Sutton admitted that he had taken a smoke break for which he had not clocked out that evening; (5) no one at Summit was able to verify for Officer Martin that Sutton had been at Summit the entire time on April 21, 2009; and (6) Sutton had a stain on his clothing that looked like mud that could have come from running through a creek." (Docket No. 78 at 7-8). In moving for summary judgment, Officer Martin insists that he "is adopting Sutton's version of events." (Docket No. 98 at 1). He does so, presumably, for two reasons.

First, Officer Martin's credibility has been drawn into question. In his deposition, Officer Martin says that before he contacted Plaintiff, he looked in Plaintiff's locker and saw muddy clothing in the locker, although he could not recall what the clothes looked like. He did not mention muddy clothing in either his incident or arrest report, nor did he collect the clothing as evidence because he did not see it as "something that added to the case." (Docket No. 88-5, Martin Depo. at 111). Both Plaintiff and Ms. Ndiaye testified that Plaintiff did not use a locker; both came to work

11

in their work clothes and did not change at the hospital. Further, Ms. Ndiaye testified that Officer Martin did not go to the locker area because she could see it from her work station and none of the officers went to the lockers that night.

Second, "if the defendant challenges the plaintiff's version of the facts, an issue of fact is created, and qualified immunity must be denied." Eggleston v. Short, 2014 WL 1257941, at *1 (6th Cir. Mar. 28, 2014). If, however, a defendant accepts a plaintiff's version of the facts, this acceptance transforms the qualified immunity question into a legal issue which allows for an interlocutory appeal of the denial of qualified immunity. See Estate of Carter v. City of Detroit, 408 F.3d 305, 309-10 (6th Cir. 2005).

While Officer Martin purports to adopt Plaintiff's version of the events, he has not actually done so. He claims that Plaintiff matched the physical description of the suspect, but Plaintiff matched the description only in the broadest sense – he, like the perpetrator, was a black male of medium build.[4] The dispatch tapes from the first call to 911 indicates that the suspect was wearing blue jeans,[5] but Plaintiff was wearing black scrubs when he was confronted by Officer Martin.

Officer Martin also claims that Plaintiff admitted that he had taken a smoke break for which he had not clocked out that evening. True, but Plaintiff also testified in his deposition that he took his smoke break at about 5:45 p.m. and was back on the job by 6:00 p.m. at the latest. The initial 911 call did not occur until 6:20 p.m., at which time Bouchard, the caller, stated the suspect was still in the woods.

Officer Martin further claims that no one at Summit was able to verify that Plaintiff was at

---

[4] In his deposition, Bouchard's described the suspect as being much taller than Plaintiff.

[5] In his deposition, Officer Martin said that he did not recall whether the suspect was described as wearing blue jeans, but conceded that he normally asks for details about what a suspect is wearing.

12

the hospital the entire work day on April 29, 2009. This again is true, but it neglects to consider Ms. Ndiaye's deposition testimony that she was with Plaintiff that day except when they both took a break at 5:45 p.m. which lasted about ten minutes.[6]

Officer Martin also claims that Plaintiff had a stain on his clothing that appeared to be mud. This, of course, presumes that the stain actually looked like mud, and ignores the fact that both Plaintiff and Ndiaye testified that spots on Plaintiff's clothing were common occurrences from cleaning the dish machine. Moreover, even if the stain on Plaintiff's scrubs looked like mud, this adds nothing to probable cause given that the suspect was alleged to have been wearing blue jeans.

"'In general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible.'" Kinlin v. Kline, 749 F.3d 573, 578 (6th Cir. 2014) (quoting Pyles v. Raisor, 60 F.3d 1211, 1215 (6th Cir. 1995)). Here, when one considers all of the evidence in a light most favorable to Plaintiff, as required by Rule 56, the very factors upon which Officer Martin relies to establish probable cause show the existence of numerous disputed issues of fact.

As an alternative, Officer Martin argues that he is entitled to qualified immunity. In denying qualified immunity in the context of Officer Martin's Motion to Dismiss, the Sixth Circuit basically held that Plaintiff stated a viable Fourth Amendment claim and that the law was clearly established that a Terry stop must be limited in its scope and duration to the purpose of the stop. Since the only basis then in the record for Officer Martin approaching Plaintiff was the possible connection to the

---

[6] In this regard, Officer Martin places too fine a point on Ms. Ndiaye's deposition testimony by claiming that it is "undisputed that Ndiaye *did not* tell Officer Martin that Sutton had been with her the entire time that evening or that she could account for his whereabouts for every minute of the evening," (Docket No. 98 at 4-5), particularly since she also testified that Officer Martin really did not appear to want to talk to her and did not ask her about a smoke break.

13

cell phone found at the Kroger store, the continued detention of Plaintiff after he produced his own phone "amounted to an arrest" and "violated the law clearly established" in Terry, United States v. Brignoni-Ponce, 422 U.S. 873 (1975), Florida v. Royer, 460 U.S. 491 (1983), and United States v. Obasa, 15 F.3d 603 (6th Cir. 1994). Sutton, 700 F.3d at 877. In the Court's opinion, that same rationale continues to apply, perhaps with even more force given the discovery record.

Officer Martin argues that continued detention was warranted even after Plaintiff produced his own cell phone because "Officer Martin's experience told him that many suspects have more than one cell phone[.]" (Docket No. 78 at 13). This begs the question of why Officer Martin even asked questions about Plaintiff's cell phone, since Plaintiff would be doomed no matter how he answered. If Plaintiff said he had no cell phone on him, Officer Martin would undoubtedly have concluded that the cell phone found at the Kroger store was Plaintiff's; if, as occurred here, Plaintiff produced a cell phone, this offered Officer Martin the opportunity to ignore what would be exculpatory evidence.

Regardless, Officer Martin's testimony about multiple cell phones is entirely self-serving, even if it is supported by the declaration of Lieutenant Chris Gilder, a training officer who happens to work for the Metro police department. Although "[a] court may not disregard evidence merely because it serves the interests of the party introducing it," Harris v. J.B. Robinson Jewelers, 627 F.3d 235, 39 (6th Cir. 2010), "self-serving explanations" can be viewed as suspect, Bishop v. Ohio Dept. of Rehab. & Corr., 529 F. App'x 685, 698 (6th Cir. 2013).

Officer Martin's explanation for discounting Plaintiff's possession of a cell phone aside, he adds little from the discovery record to support his claim that there was probable cause to detain Plaintiff. Prior to going to Summit, Officer Martin ran Plaintiff's criminal record, but that record

14

was minor and contain no charges related to theft. Officer Martin knew that Summit was in close proximity to the Kroger store, and that the suspect was a black male of medium build. When Officer Martin arrived at Summit, however, he was met by an individual who was not wearing anything close to the type of clothing described in the 911 call, and the individual before him (at least if Plaintiff's version of events is believed) had an alibi backed by a co-worker's account.

"The law has been clearly established since at least the Supreme Court's decision in Carroll v. United States, 267 U.S. 132, 162 (1925), that probable cause determinations involve an examination of all facts and circumstances within an officer's knowledge at the time of an arrest." Estate of Dietrich v. Burrows, 167 F.3d 1007, 1012 (6th Cir.1999). "The law [i]s likewise well established that an officer . . . may not ignore exculpatory evidence reasonably available to the officer when assessing probable cause." Province v. City of Detroit, 529 F. App'x 661, 663 (6th Cir. 2013). Given the record that has developed, the Court concludes that Officer Martin is not entitled to qualified immunity on the remaining Fourth Amendment claim.

### B. *State-Law Claim*

Plaintiff brings a state-law claim against Officer Martin for false arrest/false imprisonment. In moving for summary judgment on this claim, Officer Martin points out that "[a]s is the case with a Section 1983 claim, a plaintiff is required to prove he was arrested without probable cause to prove a false arrest/false imprisonment claim," and "Tennessee law applies qualified or good faith immunity to state law torts" that is akin to that provided for alleged federal constitutional violations. (Docket No. 78 at 15-16). As consequence, Officer Martin relies on the arguments he raised in support of dismissal of Plaintiff's Fourth Amendment claim for dismissal of his state-law claim.

However, this Court has determined that whether probable cause existed is an issue which

15

must be presented to the jury and that Officer Martin is not entitled to qualified immunity on the remaining federal claim. This has equal applicability to the state-law claim even though probable cause existed once Szcerbiak identified Plaintiff; this is because Tennessee law, like federal law, recognizes that a person can be seized even though a formal arrest has not been made, State v. Johnson, 2009 WL 3321362, at *9 n.5 (Tenn. Crim. App. Oct. 15, 2009), and the state constitution relating to seizures has "traditionally [been] interpreted . . . as imposing stronger protections that those of the federal constitution," State v. Moats, 403 S.W.3d 170, 182 (Tenn. 2013).

Finally, Officer Martin argues that he is entitled to statutory immunity under Tenn. Code Ann. § 40-7-116 on Plaintiff's false arrest/imprisonment claim. So far as relevant, that statute provides:

> (c) A merchant, a merchant's employee or agent, or a peace officer who detains, questions or causes the arrest of any person suspected of theft shall not be criminally or civilly liable for any legal action relating to the detention, questioning or arrest if the merchant, merchant's employee or agent, or peace officer:
>
> > (1) Has reasonable grounds to suspect that the person has committed or is attempting to commit theft;
> >
> > (2) Acts in a reasonable manner under the circumstances; and
> >
> > (3) Detains the suspected person for a reasonable period of time.

Tenn. Code Ann. 40-7-116(c). Officer Martin claims entitlement to this statutory immunity because Plaintiff concedes that he was only questioned for 15-20 minutes at Summit and Officer Sutton "had reasonable grounds to believe that Sutton had committed the theft[.]" (Docket No. 78 at 16).

"Although the statute refers to 'reasonable grounds' rather than 'probable cause,' in the context of false imprisonment claims," the Tennessee Court of Appeals "has interpreted the two terms as having the same meaning." Richards v. O'Connor Mgmt., Inc., 1998 WL 151392, at *6

16

(Tenn. Ct. App. 1998) (citing Brown v. SCOA Indus., Inc., 741 S.W.2d 916, 919 (Tenn. App. 1987)); see also Raspberry v. Thompson, 2014 WL 1795998, at *2 (W.D. Tenn. 2014). Moreover, whether an officer has acted in a reasonable manner within the meaning of the statute is generally a question of fact for the jury. See Miller v. Piggly Wiggly Supermarket, 1995 WL 75284, at *2 (Tenn. Ct. App. Feb. 24, 1995). The present record does not establish as a matter of law that probable cause existed or that Officer Martin acted reasonably.

## B. Metro's Motion for Summary Judgment

### 1. Federal Claim

Plaintiff brings a municipal-liability claim against Defendant Metro. In Monell v. Department of Social Services, 436 U.S. 658, 691 (1978) the Supreme Court held that "a municipality cannot be held liable solely because it employs a tortfeasor – or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." However, "municipalities may be held liable under § 1983 when the injury inflicted is a result of 'a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'" Radavansky v. City of Olmstead Falls, 395 F.3d 291, 311 (6th Cir. 2005) (quoting, Monell, 436 U.S. at 694).

In moving for summary judgment, Metro sets forth a number of facts in relation to Plaintiff's municipal liability claim. These include: (1) basic training for a new Metro police officer consists of approximately 800 hours of instruction; (2) Officer Martin underwent 22 weeks of basic training at the police academy when he was hired; (3) the police academy curriculum includes 120 hours of training on the law; (4) Metro police officers are required to attend 40 hours of in-service training, most of which include instruction on making arrest; (5) Metro officers have access to all General

17

Orders (Metro policies) and Tennessee laws via their laptop computers; (6) Metro officers (who are also attorneys) are available to answer legal questions from officers in the field; (7) officers are required to be familiar with all General Orders (which include the standards for reasonable suspicion, the circumstances under which warrantless arrest are allowable, and prohibits biased policing); and (8) updates on the law are disseminated to police officers, often through roll-call training.

In response to Metro's Motion for Summary Judgment, Plaintiff disputes none of these facts. He begins his brief by arguing:

> The policy of the Metropolitan Government (hereinafter "Metro"), of requiring a Metro police officer to follow the dictates of a private citizen in making an arrest, rather than considering the officer's own judgment in determining whether probable cause for an arrest exists, invites the invasion of a private citizen's Fourth Amendment rights.

(Docket No. 87 at 1). However, in the remaining seventeen pages of his response brief, Plaintiff points to absolutely no evidence that supports the notion that such a policy exists.

The bulk of Plaintiff's arguments relate to how Officer Martin did not follow specific policies. Because "'municipalities face policy-based liability under § 1983 only if a plaintiff demonstrates 'that, through its deliberate conduct, the municipality was the moving force behind the injury alleged,'" Siler v. Webber, 443 F. App'x 50, 53 (6th Cir. 2011) (quoting Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 404 (1997)), the fact that an officer does not follow a policy undercuts the idea that the policy was the cause of the violation. See Perez v. Oakland Cnty, 466 F.3d 416, 432 (6th Cir. 2006); Anderson v. Dallas Cnty., 286 F. App'x 850, 862 (5th Cir. 2008); Russell v. Hennepin Cnty., 420 F.3d 841, 849 (8th Cir. 2005).

The Court recognizes that a failure to follow policy may support a failure-to-train claim. See

18

Powers v. Cnty. of Lorain, 259 F. App'x 818, 822 (6th Cir. 2008). However, Plaintiff does not appear to be challenging Metro's training; his argument is that Metro trains its officers to follow private citizen's directives – an argument that is not supported by citation to the record.

Regardless, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." Connick v. Thompson, 131 S. Ct. 1350, 1359 (2011). "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." City of Canton v. Harris, 489 U.S. 378, 390-91 (1989). "In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." Id. at 392. Therefore, and because any "lesser standards of fault and causation would open municipalities to unprecedented liability under § 1983," id. at 391, "a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact,'" and requires proof that "city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights. Connick, 131 U.S. at 1359-60 (citation omitted). Plaintiff offers no such proof.

Plaintiff spends considerable time arguing that the show-up identification that led to Szcerbiak identifying him was unduly suggestive, quotes General Order 10-05, which relates to identification procedures, and claims essentially that Metro "permitted" officers to ignore that policy. However, and as already indicated, Plaintiff's tainted identification claim was dismissed by the Court. Moreover, the effective date of General Order 10-05 was July 26, 2010. The policy

19

simply could not have applied to an incident that occurred more than a year before and, therefore, whether Officer Martin was "permitted" not to comply with it is irrelevant.

Plaintiff has provided no evidence from which this Court (or a reasonable jury) could conclude that a policy or custom of Metro led to a deprivation of his constitutional rights. As such, summary judgment is appropriate on Plaintiff's federal municipal liability claim.

### B. *State-Law Claims*

Metro seeks summary judgment on Plaintiff's state-law claims because a municipality's state-law immunity under the Tennessee Governmental Tort Liability Act is not removed for alleged violations of "civil rights." Metro cites cases that support its argument, including this Court's decision in Okolo v. Metropolitan Government of Nashville, 892 F. Supp. 2d 931, 947 (M.D. Tenn. 2012). Plaintiff has not responded to Metro's argument. A failure to respond under Local Rule 7.01 "indicates that there is no opposition to the motion." Accordingly, summary judgment will be granted on Plaintiff's state-law claims against Metro.

### IV. **CONCLUSION**

On the basis of the foregoing, the Court will enter an Order denying Officer Martin's Motion for Summary Judgment and granting Metro's Motion for Summary Judgment.

*/s/ Kevin H. Sharp*
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE